JOURNAL ENTRY AND OPINION
Defendant-appellant appeals his guilty verdict on the charges of murder and felonious assault. Appellant Ralph Arnold, known on the street as Mann, was found guilty of the murder of Lester Colvin and of felonious assault on Miles Golden, both with gun specifications, on May 28, 1999.
At the time of the murder, Mann was living at the home of Portica Royster and her children. Also living in the apartment were his father and his father's girlfriend, Lois Skinner. Defendant used this apartment for selling drugs. Portica testified that during the time he lived there, Mann always had a 9 mm. gun. On the evening of May 28, Mann's friend, Gary Roberts, came to the apartment. Mann had Portica retrieve his gun from under her mattress and left with Gary Roberts.
Mann and Gary Roberts proceeded to the First Page Lounge where they waited until closing. After the bar closed, Lester Colvin and Miles Golden walked to their car, which was parked across the street from the bar. They stood next to the car urinating into the empty field next to the car. Miles turned and looked up to discover a dark-skinned, slender male pointing a gun at him over the roof of the car. With bullets flying around him, Miles ran to the next street where he called the police from the home of Jimmie Davis, a fifteen-year-old who lived on E. 85th Street.
The police picked up Miles at Jimmie's house and took him back to the scene of the shooting. Lester Colvin was lying dead on the ground with a bullet hole in his head. His shoes were by his feet, still tied.[1] The car had a bullet hole through a rear window, and 9 mm. shell casings were found on the ground near a tree across the street from where the car was parked. Miles was questioned extensively by the police, but could not identify the shooter other than to say that he was dark-skinned, slender and tall.
The next day, Mann stopped by Jimmie Davis's house to talk. Jimmie testified that Mann admitted to him that he had killed someone outside the First Page Lounge the previous evening. Jimmie also testified that he had not told anyone about Mann's confession until Mann was locked up, because he feared for his life.
On June 12, 1999, Mann was at Portica's apartment with two other people: Gail Brooks, a thirty-three-year-old employee of Standard Parking at the Cleveland Clinic, who was playing hooky from work to smoke crack cocaine she had bought from Mann; and Mario Adams, a twenty-one-year-old high school drop out who routinely used the building to sell marijuana. Mario testified that he spent most of his days in and around that apartment building selling marijuana where he had become acquainted with Mann. Mario stated that Mann would brag daily that he had killed a man outside the First Page Lounge the previous month.
Gail testified that on June 12th she was in the kitchen smoking crack when she answered a knock at the door while still holding the crack pipe in her hand. After she told the two men at the door that Portica was not home, they went back to the street. Gail informed Mann and Mario, who were in the living room, about the two men. After checking that the two men were detectives, Mann promised Gail he would pay her if she took a .38 gun out of the apartment. He put the gun into her bag and she walked out of the apartment, past the two men who were standing on the street outside the building, into a convenience store and bought a beer.
Gail testified that she later went back to the apartment building to collect the money Mann had promised her and was stopped by the detectives and questioned, but they never searched her bag and she was not detained.
The police proceeded to arrest Mann. Mann gave the police a statement in which he said he was in front of the bar at the time of the shooting, but that Gary Roberts did the shooting and Mann just walked down the street.
Meanwhile, Gail went with Mario to his home and gave him the gun, which he proceeded to sell to another friend. When the police learned the fate of the gun, they asked Mario to retrieve it, and he did. The autopsy on Lester Colvin produced a portion of a lead pellet which was so mangled as to be unidentifiable.
After his bond hearing, Mann was placed in city jail awaiting further processing. While in city jail, he struck up a conversation with Billy Harper, a friend of Colvin's, in the cell across from his. After several hours of conversation, Mann admitted he had killed Lester Colvin and shot at Colvin's friend.
After Mann was transferred to county jail, he struck up a friendship with Antonio Watkins, who was in the same pod. They played cards and basketball together while awaiting their trials. Mann told Watkins that he had shot at two men, hit one in the chest, and missed the other one. When his 9 mm. gun jammed, Mann said, he switched to his .38. Watkins said that Mann told him that the reason he shot the men was that they owed him $250 for drugs. Watkins told his family about the confession when he spoke to them on the phone. His family then contacted the homicide detectives who interviewed Watkins.
Although Mann's co-defendant, Gary Roberts, pleaded to the charges, the prosecutors were unable to strike a deal with Mann. During his trial, the state presented twenty-two witnesses, many of whom were vigorously cross-examined by Mann's attorneys. Mann did not present any evidence. At one point in the trial, Mann asked to speak to the judge outside the hearing of the jury. He told the judge that he thought his counsel were ineffective.
For his first assignment of error, appellant states
 I. THE DEFENDANT APPELLANT WAS DEPRIVED OF HIS RIGHTS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS WHEN THE TRIAL COURT CONDUCTED A JURY VIEW WITHOUT THE DEFENDANT BEING PRESENT.
The record shows that a jury view took place during the trial without Mann being present. When the court discovered that Mann was not present for the jury view, he ordered the jury view to be repeated with Mann present. The court stated on the record:
 I would like the record to reflect that this morning, pursuant to a request by the State, a jury view took place. Subsequent to this jury view, it was discovered that the defendant was not present despite was not present. As a result, the Court ordered that the jury return to the scene, that the jury view was then conducted in the presence of the defendant. Is there any objection to this process on the part of the State?
* * *
And on behalf of the defendant?
 Mr. DeFranco: Yes your Honor, we believe that the bailiff did a fine job of directing the jury once again. I think the jury view was satisfactory to the defense and hopefully to our client.
Tr. at 203.
The right to a jury view is determined according to R.C. 2945.16:
 When it is proper for the jurors to have a view of the place at which a material fact occurred, the trial court may order them to be conducted in a body, under the charge of the sheriff or other officer, to such place, which shall be shown to them by a person designated by the court. While the jurors are absent on such view no person other than such officer and such person so appointed, shall speak to them on any subject connected with the trial. The accused has the right to attend such view, but may waive this right.
Appellant complains that he was prejudiced by his absence on the first jury view. He fails to point out any specific prejudice resulting from his absence, however, and his trial counsel stated that he was satisfied with the jury view. Additionally, appellant's trial counsel was present for both jury views and did not object.
A jury view is not a critical portion of the trial. As the Supreme Court of Ohio stated in State v. Richey (1992), 64 Ohio St.3d 353, 367, [a] view of the crime scene is neither evidence nor a crucial stage in the proceedings. Citing State v. Tyler (1990), 50 Ohio St.3d 24, 38.
Because counsel was present at both views and never objected, because appellant has now failed to point out any prejudice resulting from his absence at the first jury view, and because his counsel agreed that there was no problem with the procedure followed, we overrule this assignment of error.
For his second assignment of error, appellant states
 II. THE DEFENDANT-APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.
The Supreme Court of Ohio has articulated the standard for determining ineffective assistance of counsel. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. State v. Bradley (1989), 42 Ohio St.3d 136, syllabus paragraph 2. The Court also determined that [t]o show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Id. at syllabus paragraph 3.
Appellant cites six errors allegedly committed by his counsel throughout the trial. The first is the absence of the defendant at the first jury view. The second is counsel's failure to object to Mann's absence from the first jury view. Because appellant has failed to articulate any prejudice resulting from his absence, we reject this claim.
Appellant's third allegation states that counsel failed to file a motion to suppress the fact that Miles Golden, the second man being shot at on that night, identified him as the shooter at the police station and that the identification was unreliable because it was based merely on height and build. He further claims that Golden's testimony puts Mann at the scene of the crime, and, therefore, was very damaging.
This complaint is without merit. First, Golden clearly states in his testimony that he could not make a positive identification of the shooter. He stated that he pointed out a picture of a man who was similar to the defendant in build, height, and color, but made it clear to the police that he could not positively identify anyone as the shooter.
Second, appellant could not have been prejudiced by Golden's testimony supposedly placing him at the crime scene when Mann's own signed police statement puts him at the crime scene at the time of the shooting. In his statement, Mann said that he was walking down E. 84th Street at the time he saw Gary Roberts lying on the ground hiding in an open field next to the bar with a gun, and that he heard approximately nine shots ring out as he walked away. He cannot claim, therefore, that Golden's placing him at the scene prejudiced him when he placed himself at the scene.
For his fourth allegation under this assignment of error, appellant complains that his attorney failed to renew his Crim.R. 29(A) motion at the close of trial. Appellant's counsel did move for acquittal pursuant to Crim.R. 29(A) at the close of the State's case. The court denied his motion at that time. Appellant did not present any evidence, however, and rested immediately after the court ruled on his Rule 29 motion. Tr. at 913. Thus there was no further evidence for the court to rule upon. Further, appellant has failed to indicate how the evidence was insufficient. Such a showing is necessary to show prejudice arising from counsel's performance.
Next appellant claims that his counsel erred in failing to object to the prosecutor's statement during his closing argument that one of the witnesses was telling the truth. Because this issue also constitutes appellant's third assignment of error alleging prosecutorial misconduct, this court will address this issue below.
Finally, appellant alleges that his attorneys failed to maintain a good working relationship with him. Addressing his concerns to the judge out of the presence of the jury, appellant complained that his attorneys failed to review the police reports prior to trial and that they refused to ask the witnesses the questions he wanted them to ask. For these reasons, he felt that his attorneys were working against him.
On the other hand, his counsel told the court they had asked most of the questions he requested and were precluded by certain rules from asking the rest. Defendant also complained that prior to questioning the witnesses at trial his attorneys had not read the witness statements. His counsel explained, however, that court rules prevented them from reviewing these statements until the statements had been reviewed by the court in camera.
The court ruled that defendant's attorneys were extremely qualified trial lawyers, both of whom were specially trained and certified by the Ohio Supreme Court to handle death penalty cases * * *. Tr. at 672. The court further found both attorneys to have performed their duties in the highest traditions of their profession during the proceedings of the case. The court then denied defendant's request for a change of counsel.
Defendant has failed to show how the outcome of the trial would have been different if his attorneys would have asked the questions he claims were omitted: in fact, he does not state any of the questions he complains about. Absent evidence of prejudice to the defendant, ineffective assistance of counsel cannot be proven.
Defendant has failed to show that his trial counsel did not meet the necessary standard, and he has failed to show that the outcome of his trial would have been different but for counsel's chosen defense. The second assignment of error is overruled.
For his third assignment of error, appellant states,
 III. THE DEFENDANT APPELLANT WAS DENIED A FAIR TRIAL DUE TO MISCONDUCT OF THE PROSECUTING ATTORNEY.
Defendant cites one statement by the prosecutor which he claims prejudiced the outcome of his trial. In closing, the prosecutor reminded the jurors of each witness against the defendant and noted the courage it took for the witnesses to testify against him. When the prosecutor addressed the testimony of Jimmie Davis, he stated that Davis, despite warning visits from defendant and one of defendant's friends, came in here like a good citizen, did what he was supposed to do, came in here and told the truth. Tr. at 974. (Emphasis added.) Defendant claims that by vouching for the credibility of the witness, the prosecutor denied him a fair trial.
While defendant is correct in stating that [i]t is improper for an attorney to express his personal belief or opinion as to the credibility of a witness * * * State v. Smith (1984), 14 Ohio St.3d 13, 14, [t]he test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. State v. Smith (2000), 87 Ohio St.3d 424, 442. Taken in the context of the prosecutor's closing argument and the point that the prosecutor was trying to make concerning the motivation of the witnesses, we cannot find that the prosecutor's statement had any significant impact on the outcome of the trial.
Even without a closing argument of any sort, the evidence was more than sufficient to convict the defendant. Five different witnesses testified that defendant had told them he had murdered the victim. Defendant's own signed police statement put him at the scene of the crime. Testimony verified that on the night of the murder he was carrying the type of gun used in the murder, and testimony showed him getting rid of the other type of gun used in the murder. There was also evidence he disposed of used shells from one of the guns in the toilet at his home. The record belies the claim that the jury relied on an isolated comment concerning the credibility of one of many witnesses in convicting the defendant. Because defendant has failed to show how the prosecutor's isolated remark adversely affected the outcome of his trial, the third assignment of error is overruled.
For his fourth assignment of error, appellant states,
 IV. DEFENDANT APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Defendant claims that the jury lost its way. It was exposed to improperly admitted evidence and vouching as a result of ineffective assistance of counsel and prosecutorial misconduct. Appellant's brief at 16. He further claims that [t]here was no direct or circumstantial evidence linking Appellant to this crime. Id.He provides no other argument in support of this assignment of error.
When addressing a weight of the evidence argument, the appellate court acts as a thirteenth juror.
 Weight of the evidence concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.
 It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief. (Emphasis added.)
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, citing Black's Law Dictionary (6 Ed. 1990) 1594.
As noted in our discussion in the third assignment of error, ample evidence exists to induce a belief of defendant's guilt. Five people testified that defendant had admitted, even bragged, to them about committing the murder. Further, evidence placed defendant at the crime scene with a weapon consistent with the murder weapon. He errs when he claims in his brief that there is no circumstantial evidence against him. The jury's verdict was not against the manifest weight of the evidence.
The fourth assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., J., CONCURS; JAMES D. SWEENEY, J., CONCURS IN JUDGMENT ONLY.
[1] Testimony showed that the decedent owed drug money to the defendant. Defendant's search of the body allegedly included checking his shoes for money.